UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 11-20373-CR-LENARD/O'SULLIVAN

UNITED STATES OF AMERICA,

 Plaintiff,

v.

YENNY RENE LOPEZ,
VICTOR A. PEREZ and
ELMIS RUIZ RICANO,

 Defendants.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on the Defendant Yenny Lopez's Motion to Suppress (DE# 44, 9/13/11) and the Defendant's Motion to Suppress (DE# 48, 9/15/11) filed by defendant Victor A. Perez.[1] Having held an evidentiary hearing on October 18, 2011 and carefully considered the applicable filings and the law, the undersigned respectfully recommends that the Defendant Yenny Lopez's Motion to Suppress (DE# 44, 9/13/11) and the Defendant's Motion to Suppress (DE# 48, 9/15/11) be **DENIED** for the reasons stated herein.

## BACKGROUND

The defendants are charged with conspiracy to possess with intent to distribute marijuana, in violation of Title 21, United States Code, Section 846, using and

---

[1] Defendant Victor A. Perez moved to join defendant Lopez' motion to suppress. See Defendant's Motion to Suppress and Joinder (DE# 48, 9/15/11). Defendant Elmis Ruiz Ricano moved to join defendant Lopez and defendant Perez' motions to suppress. See Motion by Elmis Ruiz Ricano to Adopt Co-defendant Yenny Lopez' Motion to Suppress and Co-defendant Victor Perez' Motion to Suppress and Joinder (DE# 53, 9/20/11). The undersigned granted both motions for joinder. See Order (DE# 52, 9/15/11); Order (DE# 55, 9/28/11).

maintaining a place for manufacturing a controlled substance in violation of Title 21, United States Code, Section 856(a)(1) and possession with intent to distribute marijuana plants in violation of Title 21, United States Code, Sections 841(a)(1). See Indictment (DE# 19, 5/27/11).

On September 13, 2011, defendant Yenny Lopez filed a motion to suppress. See Defendant Yenny Lopez's Motion to Suppress (DE# 44, 9/13/11). Defendant Victor Perez filed his motion to suppress on September 15, 2011 and joined in defendant Lopez' motion. See Defendant's Motion to Suppress (DE# 48, 9/15/11). On September 20, 2011, defendant Elmis Ruiz Ricano joined in both motions to suppress. See Motion by Elmis Ruiz Ricano to Adopt Co-defendant Yenny Lopez' Motion to Suppress and Co-defendant Victor Perez' Motion to Suppress and Joinder (DE# 53, 9/20/11). The government filed its response on September 27, 2011. See Response in Opposition to Defendants' Motions to Suppress (DE# 54, 9/27/11). The defendant Perez filed his reply on September 30, 2011. See Defendant's Reply to Government's Response in Opposition (DE# 56, 9/30/11).

The undersigned held an evidentiary hearing on October 18, 2011. At the evidentiary hearing, the government presented the testimony of Officers Edgardo Bartra, Rolando Rios, Julio Benavides and Joseph E. Mendez. The undersigned admitted into evidence the government's Exhibits 1 through 4C, Defendant Yenny Lopez' Exhibits 1 through 4 and defendant Victor Perez' Exhibits 1 through 8. Defendant Elmis Ruiz Ricano did not seek to admit any exhibits. The defendants did not call any witnesses. Following the hearing, the undersigned permitted the parties to file supplemental memoranda of law on the curtilage issue. See Defendant's

Supplemental Brief (DE# 75, 10/24/11) filed by Mr. Perez; Yenny Lopez & Elmis Ruiz-Ricano's Supplemental Brief (DE# 76, 10/24/11); United States' Supplemental Response Brief (DE# 79, 10/31/11). This matter is now ripe for consideration.

## **FINDINGS OF FACT**

Law enforcement officers received a tip from a cooperating defendant that a residence located at 15990 SW 302 Terrace, Homestead, Florida (hereinafter "Target Residence") was being used as a marijuana grow house. The Target Residence was enclosed by a fence. See Defendant Perez' Exhibit 1. The portion of the fence that stretched across the front of the Target Residence was a white metal fence. To the left of the white metal fence was an mechanical gate. The mechanical gate impeded access to and from the driveway. At the center of the white metal fence was a hinged gate which led directly to the front door of the Target Residence. Id. A white panel covered most of the fence at the front of the residence. The white panel did not cover the mechanical gate or the hinged gate. Id. The mechanical gate and the hinged gate remained closed.

Officers conducted surveillance of the Target Residence on May 10, 2011. On that day, they observed a red vehicle parked in the driveway of the Target Residence. They observed an individual, later identified as defendant Yenny Lopez, enter the vehicle. When officers conducted a driving history search of Mr. Lopez, they learned that Mr. Lopez owned a vehicle that fit the description of the one parked outside the Target Residence.

On May 12, 2011 at approximately 5:30 or 6:00 AM, Officer Edgardo Bartra conducted surveillance of the Target Residence. Officer Bartra remained in his vehicle

while conducting surveillance that day. He observed a man feeding two dogs in the driveway inside the fence. The mechanical gate and the hinged gate remained closed while Officer Bartra conducted surveillance on May 12, 2011.

On the same day, police conducted surveillance of a residence located at 1685 SW 8th Street, Homestead, Florida (hereinafter "Owner Residence"). The officers observed several vehicles parked in front of the Owner Residence. One of these vehicles was a two-toned Kia minivan. From their investigation, the officers learned that Mr. Lopez resided in the Owner Residence with his wife and his parents. The Target Residence was owned by Mr. Lopez' wife. The officers further learned that Mr. Lopez had not updated the address where he was residing and that his license had expired in November 2010.

In the early morning of May 13, 2011, Officer Bartra drove back to the Target Residence to conduct further surveillance. Officer Bartra was in an unmarked police vehicle. Officer Rolando Rios was also present in a separate unmarked police vehicle. At approximately 7:00 AM, Officer Bartra observed two men in the driveway of the Target Residence. One of the men (later identified as defendant Ruiz Ricano) entered the driver's side of a vehicle parked in the driveway of the Target Residence. The other man (later identified as defendant Perez) got near the mechanical gate to open it.[2] It appeared to Officer Bartra that the men were getting ready to leave the Target Residence.

After Mr. Perez opened the mechanical gate, Officer Bartra approached the gate

---

[2] Officer Bartra believed that Mr. Perez used an electric clicker to open the gate but he did not see how Mr. Perez opened the gate.

in his unmarked police vehicle and turned on his red and blue lights. Officer Bartra parked his vehicle on the swale in front of the Target Residence, blocking the driveway and precluding the defendants' vehicle from leaving the driveway. Officer Bartra exited his vehicle and identified himself as a police officer. Officer Bartra was wearing his police vest and his police badge. Officer Bartra did not have his weapon drawn when he approached the men. Officer Bartra told Messrs. Ruiz Ricano and Perez that he was there to conduct an investigation. Neither defendant objected to Officer Bartra's presence on the property.  A short time later, Officer Bartra entered the curtilage of the Target Residence – the area inside the fence. There, Officer Bartra observed a strong odor of marijuana emanating from inside the Target Residence.[3]

Officer Rios also approached the Target Residence.[4] Officer Rios spoke to Mr. Perez. Officer Rios asked Mr. Perez if he lived in the residence. While speaking to Mr. Perez, Officer Rios could smell marijuana. This conversation took place inside the curtilage of the Target Residence. At some point Mr. Perez told Officer Rios that he would need a search warrant to go inside the Target Residence. Mr. Perez did not object to Officer Rios being in the curtilage of the Target Residence. Officer Rios asked Mr. Perez is there was anyone else inside the Target Residence. Mr. Perez responded that he did not know. Officer Rios walked up to the front door of the Target Residence

---

[3] The odor of marijuana growing inside a residence can sometimes be perceptible from outside that residence. The strength of the odor depends on the gestation stage of the plants. The marijuana plants found inside the Target Residence were in various stages of gestation. Some of the marijuana plants were already budding. Marijuana plants at this late stage of gestation have a more potent smell.

[4] Officer Rios approached the target residence after observing Officer Bartra's vehicle approaching it.

5

and knocked.

On the same day, May 13, 2011, officers observed Mr. Lopez driving the two-toned Kia minivan.[5] Mr. Lopez had been spotted in the vicinity of the Target Residence. Officers pulled over Mr. Lopez for a traffic stop. Officer Mendez transported Mr. Lopez to the Target Residence. Officer Mendez handcuffed Mr. Lopez while in transit to the Target Residence for officer safety.

When they arrived at the Target Residence, Officer Mendez uncuffed Mr. Lopez and sat him down in a chair in front of the Target Residence. Officer Mendez presented Mr. Lopez with a document entitled Advice of Rights. See Government's Exhibit 2A. The document was in Spanish. Officer Mendez spoke to Mr. Lopez in both English and Spanish. The first part of the Advice of Rights form notified Mr. Lopez of his Miranda rights. Mr. Lopez initialed next to each right. Id. Towards the middle of the document it asks two questions: "Do you understand your rights?" and "Are you willing to answer some questions?" Mr. Lopez left these portions of the form blank. The second part of the document contained the heading "Waiver of Rights."  It stated: "[ ] I have read or [ ] someone has read to me this advice of rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer questions without a lawyer present." Id. (brackets in original).[6] Mr. Lopez signed the form at approximately 7:45

---

[5] Mr. Ruiz Ricano had been observed driving the two-toned Kia minivan the previous day.

[6] The Advice of Rights form signed by Mr. Lopez, Government's Exhibit 2A, was in Spanish. The government also filed the Advice of Rights form signed by co-defendant Victor Perez, Government's Exhibit 2C. The form signed by Mr. Perez was in English. At the evidentiary hearing, the government represented that the form signed by Mr. Perez is an accurate English translation of the forms signed by Messrs. Lopez and

6

AM. Id. Mr. Lopez' demeanor was calm and he did not object to being questioned. Officer Mendez did not have his weapon drawn when he presented Mr. Lopez with the Advice of Rights form. After Mr. Lopez waived his Miranda rights, Officer Mendez asked him some questions.

Officers also presented Mr. Ruiz Ricano with an Advice of Rights form. See Government's Exhibit 2B. Mr. Ruiz Ricano appeared calm. The Advice of Rights form was in Spanish. The form signed by Mr. Ruiz Ricano contained the same Miranda waiver statement as the form signed by Mr. Lopez. Id.  Like Mr. Lopez, Mr. Ruiz Ricano initialed the first portion of the form listing each right and left the two middle questions – "Do you understand your rights?" and "Are you willing to answer some questions?" – blank. Id. Mr. Ruiz Ricano placed a check mark on the first bracket in the following statement: "[ ] I have read or [ ] someone has read to me this advice of rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer questions without a lawyer present." Id. (brackets in original). Mr. Ruiz Ricano signed the Advice of Rights form agreeing to waive his Miranda rights at approximately 9:05 AM. Id.

After he signed the form, Mr. Ruiz Ricano told officers that he was a diabetic and that he was feeling a little light headed. Mr. Ruiz Ricano told Officer Bartra that his insulin kit was in the refrigerator inside the Target Residence. Officer Bartra went inside the residence with Mr. Perez to retrieve the insulin kit and a piece of flan.[7] Officer Bartra

---

Ruiz Ricano. See Government's Exhibits 2A-2C. The defendants did not object to this representation.

[7] A Spanish custard.

did not search the residence when he went inside. When Officer Bartra returned with the insulin kit, Mr. Ruiz Ricano gave himself an insulin shot. Officer Bartra also called emergency medical technicians (hereinafter "EMT"). When EMT arrived on the scene, Mr. Ruiz Ricano declined to be transported to the hospital.

Officer Julio Benavides arrived at the Target Residence at approximately 11:00 or 11:30 AM on May 13, 2011. The defendants were sitting by the side of the house, in handcuffs when Officer Benavides arrived. Officer Rios informed Officer Benavides of what he had learned during his investigation. Officer Benavides used this information as well as his own personal observations[8] to prepare the affidavit for the search warrant. See Government's Exhibit 1. Officer Benavides did not rely on any information Officer Bartra may have learned from entering the Target Residence to retrieve the insulin kit. Other than Officer Bartra, who entered the Target Residence to retrieve the insulin kit, none of the officers entered the Target Residence before the search warrant was obtained. Officer Benavides left the Target Residence to obtain a search warrant from a state court judge.

At approximately 3:00 PM, police executed the search warrant at the Target Residence. See Government's Exhibit 1. Officers recovered live marijuana plants and grow house paraphernalia from inside the Target Residence. See Government's

---

[8] Officer Benavides also observed the smell of marijuana from inside the curtilage of the Target Residence. Officer Benavides walked to the front door of the Target Residence. The odor of marijuana was stronger near the front door of the residence. Officer Benavides also heard humming sounds. These humming sounds were consistent with the equipment used in marijuana grow houses – indoor air conditioners, transformers, blowers, fans and water pumps. Officer Benavides did not enter the Target Residence prior to obtaining the search warrant.

Exhibits 4A, 4B, and 4C.

## ANALYSIS

**A.     Curtilage**

The Fourth Amendment protects persons against unreasonable searches and seizures by the government. United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).  The Fourth Amendment's protections extend to the curtilage of the home. "The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself." United States v. Taylor, 458 F.3d 1201, 1206 (11th Cir. 2006) (citing Oliver v. United States, 466 U.S. 170, 180 (1984)). The Fourth Amendment "is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)).

The defendants argue that their Fourth Amendment rights were violated when law enforcement officers crossed into the curtilage of the Target Residence while defendant Perez momentarily opened the mechanical gate so that he and defendant Ruiz Ricano could leave the Target Residence.[9] The defendants rely on Fernandez v. State, 63 So. 3d 881 (Fla. 3d DCA 2011) (per curiam). In Fernandez, the appellate court reversed the trial court's order denying the defendant's motion to suppress. In Fernandez, the law enforcement officers received an anonymous tip that a home was being used as a marijuana hydroponics lab. Id. at 882. Police drove to the property to

---

[9] The government does not contest defendant Yenny Lopez' standing to challenge the search of the Target Residence.

9

investigate. They set up surveillance around the perimeter of the property. Id. "The one-acre lot was completely enclosed by tall fences, and it was hidden from view by a tall hedge. The house was set back into the lot and not visible from the street." Id. When the defendant opened a metal gate to drive out of the property, a police officer slipped inside the gate. Another police officer drove his vehicle into the driveway precluding the defendant from exiting the driveway. Id. at 882-83. Two other officers walked through the gate into the property. Id. at 883. Police spoke to the defendant. The defendant refused to sign a consent form but opened the door of the residence for police. Police found 144 marijuana plants inside the residence. Id. The trial court denied the defendant's motion to suppress. The appellate court reversed concluding that "[w]hen [the first police officer] slipped into the gate that serendipitously opened while the police were surveilling the property, he committed a trespass onto the defendant's property. The consent arguably obtained from the defendant after the trespass did not cure the taint of the illegality." Id.

    Fernandez is a state court case and is not binding on this Court.[10] One distinction between the facts of Fernandez and the instant case is that the fence surrounding the property in Fernandez completely obscured the property from street view whereas here, the white panel covered only a portion of the fence and police officers were able to see

---

[10] As the government notes in its supplemental brief, "[n]ot all the [Florida] District Courts of Appeal have spoken as sweepingly about the privacy of the curtilage as did the Fernandez court. See Nieminski v. State of Florida, 60 So. 3d 521, 526 (Fla. 2d DCA 2011) (officer's entry onto the property was lawful even though he opened a closed, unlocked driveway gate that did not contain a posted "no trespassing" sign or similar warning)." United States' Supplemental Response Brief (DE# 79 at 1 n.1, 10/31/11).

10

through the uncovered portions of the fence into the curtilage of the Target Residence. This suggests to the undersigned that the defendant in Fernandez had more of an expectation of privacy than the defendants who were residing in the Target Residence in the instant case.

In any event, the undersigned concludes that based on United States v. Taylor, 458 F.3d 1201, 1206 (11th Cir. 2006), the officers in the instant case did not violate the defendants' Fourth Amendment rights when they entered the curtilage of the Target Residence upon defendant Perez opening the mechanical gate. In Taylor, an emergency dispatcher received a 911 call. Id. at 1203. The caller hung up without saying anything. The dispatcher returned the call twice but the person who answered the telephone hung up each time. A police officer drove to the residence where the call was placed to investigate. Id. A second police officer arrived a few minutes later. Id. The residence was located on a five-acre lot. It included a house, a barn and a pond. Id. A field or livestock fence surrounded the perimeter of the property. The first police officer drove onto the property passing through an unlocked gate. Id. The officer knocked on the front door of the residence. The defendant walked out from behind the barn. The defendant spoke to the officer concerning the circumstances of the 911 telephone call. The defendant indicated that he and his girlfriend had gotten into an argument. Id. The officer grew concerned about the safety of the defendant's girlfriend and asked if he could look around "to 'make sure nobody is back there and everything is okay.'" Id. The defendant agreed. The police officer subsequently discovered shotgun shells inside a green military-style pack in the pond. Id. The officer placed the defendant in the back of the patrol car and went back to the pond where he discovered

a shotgun. Id. at 1204. The defendant moved to suppress the shotgun. The district court denied the motion to suppress. On appeal, the Eleventh Circuit affirmed the district court. The Eleventh Circuit concluded that the police lawfully entered onto the defendant's property. Id. at 1208.

The actions of the officers in the instant case are much less intrusive than in United States v. Byle, No. 8:10–CR–419–T–30TGW, 2011 WL 1983359, at *11 (M.D. Fla. Apr. 15, 2011).[11] In Byle, the court, relying on Taylor, concluded that a law enforcement officer could open a gate that was closed but not locked in order to conduct a knock and talk. Here, defendant Perez himself, and not the officers, opened the mechanical gate. Having determined that the officers were lawfully inside the curtilage of the Target Residence when they observed the odor of marijuana emanating from the Target Residence, the undersigned finds that the officers' observations should not be suppressed and appropriately support the issuance of a search warrant. Although Officer Bartra entered the Target Residence prior to the issuance of the search warrant, Officer Bartra entered the Target Residence for the limited purpose of retrieving Mr. Ruiz Ricano's insulin kit and did not conduct a search of the Target Residence. Of importance, Officer Benavides did not rely on any of Officer Bartra's observations in preparing the affidavit supporting the issuance of the search warrant. For these reasons, the undersigned concludes that the evidence recovered from the

---

[11] Byle was a report and recommendation. The report and recommendation was "adopted, confirmed and approved in all respects" by the district judge in United States v. Byle, No. 8:10–CR–419–T–30TGW, 2011 WL 1983355, at *5 (M.D. Fla. May 20, 2011) and the defendant's motion for reconsideration and supplemental motion to suppress were denied in United States v. Byle, No. 8:10–CR–419–T–30TGW, 2011 WL 2435349, at *1 (M.D. Fla. Jun. 15, 2011).

search of the Target Residence should not be suppressed.

**B.     Defendants' Post-<u>Miranda</u> Statements**

Defendants Lopez and Ruiz Ricano[12] further argue that the statements they provided to law enforcement must be suppressed because they were taken in violation of their <u>Miranda</u> rights. Specifically, defendants Lopez and Ruiz Ricano argue that they did not completely fill out the <u>Miranda</u> waiver forms. <u>See</u> Government's Exhibits 2A and 2B. The government maintains that defendants Lopez and Ruiz Ricano waived their <u>Miranda</u> rights and, as a result, their post-<u>Miranda</u> statements should not be suppressed.

In order to establish a waiver of <u>Miranda</u> rights, the government must show, by a preponderance of the evidence, that the defendants voluntarily, knowingly, freely and intelligently waived those rights, with knowledge of the consequences of the waiver. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).  The validity of the waiver depends upon the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. <u>Edwards v. Arizona</u>, 451 U.S. 477, 482 (1981).

Here, defendants Lopez and Ruiz Ricano were presented with written <u>Miranda</u> waiver forms in Spanish. <u>See</u> Government's Exhibit 2A and 2B. Both defendants appeared calm when they spoke to Officer Mendez. The defendants were not coerced nor threatened into making statements to law enforcement. Although neither defendant answered the two questions on the form –"Do you understand your rights?" and "Are

---

[12] At the evidentiary hearing, defendant Perez indicated that he only objects to the search of the Target Residence. Mr. Perez gave no statements to law enforcement.

you willing to answer some questions?," they both placed their initials next to the rights listed on the form and signed the bottom paragraph of the form. Id. That paragraph, states in part, "I understand what my rights are" and "I am willing to freely and voluntarily answer questions without a lawyer present." Id. Thus, the undersigned concludes that defendants Lopez and Ruiz Ricano knowingly and voluntarily waived their Miranda rights. Accordingly, it is recommended that defendants Lopez and Ruiz Ricano's motion to suppress post-Miranda statements be **DENIED**.

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Defendant Yenny Lopez's Motion to Suppress (DE# 44, 9/13/11) and the Defendant's Motion to Suppress (DE# 48, 9/15/11) filed by defendant Victor A. Perez be **DENIED**. Pursuant to 28 U.S.C. §636(b)(1)(B) and (c), the parties may serve and file written objections to this Report and Recommendation with the Honorable Joan A. Lenard, United States District Judge, within fourteen (14) days of receipt of a copy of this Report and Recommendation. See Nettles v. Wainwright, 677 F. 2d 404 (5th Cir. 1982).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this **8th** day of November, 2011.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
United States District Judge Lenard
All counsel of record