## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20373-CV-LENARD/O'SULLIVAN

**UNITED STATES OF AMERICA,**

      Plaintiff,

v.

**YENNY RENE LOPEZ,**
**VICTOR A. PEREZ, and**
**ELMIS RUIZ RICANO,**

      Defendants.

_____/

## ORDER ADOPTING IN PART REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE (D.E. 81), ADOPTING IN FULL SUPPLEMENTAL REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE (D.E. 129), AND GRANTING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE (D.E. 44, 48)

      **THIS CAUSE** is before the Court on Magistrate Judge John J. O'Sullivan's Report and Recommendation (D.E. 81), issued November 8, 2011, and Supplemental Report and Recommendation (D.E. 129), issued January 31, 2012. Defendants filed Motions to Suppress Evidence (D.E. 44, 48) on September 13 and 15, 2011. The Government filed a Response (D.E. 54) on September 27, 2011, and Defendants filed a Reply (D.E. 56) on September 30, 2011. This Court referred Defendants' Motions to Judge O'Sullivan, who convened a suppression hearing on October 18, 2011. (See D.E. 107.) Defendants submitted Supplemental Briefs (D.E. 75, 76) on October 24, 2011, to which the Government filed a Supplemental Response Brief (D.E. 79) on October 31, 2012. Judge O'Sullivan then issued his first Report recommending that this Court deny

Defendants' Motions to Suppress.  Defendants filed Objections (D.E. 84, 85, 89, 91), on November 19, 21, and 23, 2012, to which the Government filed its Response (D.E. 94) on November 30, 2011.  This Court subsequently referred the case back to Judge O'Sullivan for supplemental findings on the issue of consent.  (See D.E. 99.)  Judge O'Sullivan heard additional testimony on January 25, 2012 (see D.E. 127), and issued a Supplemental Report finding that Defendants did not provide consent for law enforcement to enter the property.  This Court then solicited supplemental briefing on the applicability of the good-faith exception to the exclusionary rule.  Defendants filed their Supplemental Brief (D.E. 132) on March 14, 2012.  The Government filed its Brief in Opposition (D.E. 134) on March 26, 2012, and Defendants filed their Reply (D.E. 135) on April 2, 2012.   Having reviewed the Motions, Report and Recommendation, Objections, Response, Supplemental Report and Recommendation, Supplemental Briefs, and the record, the Court finds as follows.

## I.    Facts

In May 2011, law enforcement received a tip from a cooperating source that the residence located at 15990 SW 302 Terrace in Homestead, Florida (the "Target Residence") was a marijuana grow house.  The property was owned by Defendant Yenny Lopez's wife.  Police also learned that Lopez and his wife lived at another Homestead residence located at 1685 SW 8th Street (the "Owner Residence").

Officers began surveilling the Target Residence on May 10, 2011.  The property was enclosed by a white, vertical-bar wrought-iron fence.  The fence contained opaque white paneling which blocked views from the street.  The fence had two gates.  One was

a wide mechanical gate, located toward the left side of residence, which allowed cars to get in and out of the driveway.  The other was a narrower hinged gate, located toward the middle of the residence, which led to front door.  Neither of the gates contained white paneling, meaning that outsiders could view into the premises at those locations.  On May 10, officers observed a red vehicle parked in the residence driveway.  They also observed an individual, later identified as Lopez, enter the vehicle.

On May 12, 2011, Officer Julio Benavides and several other officers evidently went to the Target Residence in an attempt to contact the owner.   Officer Benavides discovered that the home was surrounded by the wrought-iron fence and that the gates were locked.  He left, though other officers remained to conduct surveillance.  Officer Edgardo Bartra surveilled the Target Residence from an unmarked police car.  Officer Bartra observed a man, later identified as Defendant Victor Perez, feeding two dogs in the residence driveway.  The mechanical gate and hinged gate remained closed.

The same day, police surveilled the Owner Residence.  Officers observed several vehicles parked in front, one of which was a two-toned Kia minivan.

Officer Bartra surveilled the Target Residence again on May 13, 2011.  Officer Rolando Rios was also stationed nearby in a separate, unmarked police car.  Both of the residence gates were closed, and a vehicle was parked in the driveway.  At approximately 7 AM, Officer Bartra observed two men, later identified as Perez and Defendant Elmis Ruiz Ricano, in the driveway.  Ricano entered the driver's side of the parked vehicle. Perez approached the mechanical gate to open it.

As Perez opened the mechanical gate, Officer Bartra approached in his vehicle and activated his lights.   Officer Rios approached as well.   Office Bartra parked on the driveway swale, blocking the gate and preventing Defendants from leaving.   Officer Bartra exited his vehicle and identified himself as police.   He was wearing a police vest and badge.   Officer Bartra told Ricano and Perez that he was there to conduct an investigation.

Shortly thereafter, Officer Bartra entered an area of the property located within the boundary of the metal fence/gate.   Officer Bartra did not ask Defendants for permission to enter.   While there, Officer Bartra detected a strong odor of marijuana emanating from the residence.

Officer Rios also entered the fence boundary to speak with Perez.   During their conversation, Officer Rios smelled marijuana.   Officer Rios asked Perez if there was anyone else inside the residence.   Perez responded that he did not know.   Officer Rios walked up to the front door and knocked.   Perez told Office Rios that he would need a warrant to search the house.   Officer Rios remained outside for the time being.

Meanwhile, officers observed Lopez driving the two-toned Kia minivan in the vicinity of the Target Residence.   By that point they had learned that Lopez's driver's license was expired.   Officer Joseph Mendez pulled Lopez over.   Officer Mendez subsequently placed Lopez in handcuffs and transported him to the Target Residence. Officer Mendez intended to ask him questions in furtherance of the investigation.

After arriving at the Target Residence, Lopez was uncuffed and advised of his Miranda rights.   He signed a Miranda waiver at 7:45 AM and responded to police

questioning.  Ricano was also advised of his rights and signed a <u>Miranda</u> waiver at 9:05 AM.

Ricano then informed officers that he was a diabetic and was feeling lightheaded. He told Officer Bartra that his insulin kit was in the refrigerator of the residence.  Officer Bartra entered the residence with Perez to retrieve the insulin kit and a piece of flan. Officer Bartra did not otherwise search the residence while inside.  Officer Bartra returned with the insulin kit, and Ricano gave himself a shot.  Officer Bartra also called emergency medical technicians to the scene, though Ricano refused transport to the hospital.

Officer Julio Benavides arrived at the scene at approximately 11:00 or 11:30 AM. Officer Benavides smelled marijuana from within the curtilage of the residence.  He also walked to the front door, where he heard humming sounds consistent with the sounds of marijuana-grow-house equipment.  Officer Rios informed Officer Benavides of what he had learned during his investigation.   Officer Benavides prepared a search warrant affidavit based on the information collected.

Police subsequently obtained and executed a warrant to search the Target Residence.  They recovered live marijuana plants and grow house paraphernalia.

Defendants were indicted on three counts: conspiracy to possess a controlled substance with intent to distribute, 21 U.S.C. §§ 846, 841(a)(1), maintaining a place for the manufacture of a controlled substance, <u>id.</u> § 856(a)(1), and manufacturing and possessing a controlled substance with intent to distribute, <u>id.</u> § 841(a)(1).

## II.     Motions to Suppress

Defendants move to suppress all evidence and statements obtained as a result of the police entry and search.  Defendants argue that law enforcement violated their Fourth Amendment rights by entering the curtilage of the Target Residence without a warrant, probable cause, or consent.   Accordingly, Defendants argue that all evidence and statements obtained thereafter should be suppressed pursuant to the exclusionary rule as fruit of the poisonous tree.

The Government maintains that law enforcement acted lawfully by entering the property when the mechanical gate was opened.  The Government argues that Defendants provided tacit consent to enter.  The Government further claims that the drug evidence was subsequently obtained pursuant to a valid search warrant supported by probable cause.  The Government contends, in the alternative, that any arguably unlawful activity should be excused by the good-faith exception to the exclusionary rule.

## III.    Reports and Recommendations

In his first Report and Recommendation, Magistrate Judge O'Sullivan made the foregoing factual findings.  He also concluded that the investigating officers' conduct was lawful and the Government's evidence therefore admissible.   Then in his Supplemental Report, Judge O'Sullivan found that Defendants did not provide consent for officers to enter the area within the Target Resience fence.

## IV.    Standard of Review

Upon receipt of the Magistrate's Report and the Parties' Objections, the Court must now "make a de novo determination of those portions of the report or specified

proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); accord FED. R. CIV. P. 72(b)(3). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## V. Discussion

For the reasons stated herein, the Court adopts the factual findings of Judge O'Sullivan's first Report but rejects its legal analysis and conclusion. The Court adopts Judge O'Sullivan's Supplemental Report in its entirety. The Court concludes that the officers' search in this case was unlawful and that the products of the search must be suppressed.

### a. Fourth Amendment

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Evidence obtained in violation of a defendant's Fourth Amendment rights may not be used against him in a subsequent criminal prosecution. See Weeks v. United States, 232 U.S. 383, 398 (1914).

### b. Entry onto Curtilage

Defendants argue that the investigating officers unlawfully entered the curtilage of the Target Residence, and that only from inside the curtilage did the officers first smell marijuana and acquire probable cause supporting the search warrant. There appears no

7

dispute that, before the officers first stepped within the fence/gate boundary, they had neither a warrant nor probable cause to support entry.  The first issue, therefore, is whether the area entered by the police in fact constituted "curtilage" implicating Defendants' Fourth Amendment rights in the first instance.

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586 (1980), and the Fourth Amendment's protection against warrantless searches and seizures extends to "curtilage," the land immediately surrounding and associated with the home, Oliver v. United States, 466 U.S. 170, 180 (1984); see also United States v. Jones, 132 S. Ct. 945, 953 (2012).

Determining whether property constitutes "curtilage" involves consideration of four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  United States v. Dunn, 480 U.S. 294, 301 (1987).

To be sure, the Fourth Amendment is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises.  Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971).  Absent express orders from the person in possession, an officer may walk up the steps and knock on the door of any man's castle with the honest intent of asking questions of the occupant thereof, and officers are allowed to approach the residence seeking to speak to the inhabitants just as any private citizen may.  United States v. Taylor, 458 F.3d 1201, 1204

(11th Cir. 2006).  "Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g. walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment."  Coffin v. Brandau, 642 F.3d 999, 1012 (11th Cir. 2011) (quoting 1 Wayne R. LaFave, Search and Seizure § 2.3(f) (4th ed. 2004)).  "This is because a portion of the curtilage, being the normal route of access for anyone visiting the premises, is only a semi-private area."  Id. (quoting LaFave, supra, § 2.3(f)).  In carrying out their duties, the police are free to go where the public would be expected to go.  Id. (citing LaFave, supra, § 2.3(c)).

Here the Court finds that the area within the Target Residence's metal fence and gates—and specifically the areas occupied by Officers Bartra, Rios, and Benavides at the time they smelled marijuana and heard the sounds of marijuana-grow-house equipment—constituted curtilage subject to fundamental Fourth Amendment protections.  The area was close in proximity to the residence, was enclosed within the metal fence and contiguous gates, and was shielded by the fence's white paneling to block observation from outside.  Although the driveway may have been used for ingress to and egress from the property, and although the driveway gate did not contain obstructive paneling, the closed, locked mechanical gate clearly delineated the driveway as a private area which visitors—and thus the investigating officers—were not expected to encroach.  See, e.g., Edens v. Kennedy, 112 F. App'x 870, 875 (4th Cir. 2004); United States v. Hambelton, No. 1:08cr26-SPM, 2009 WL 722284, at *4 (N.D. Fla. 2009).  Moreover, although at one point Perez opened the gate so that he and Ricano could exit, one cannot say that this

brief opening of the gate converted the driveway into only a semi-private area through which visitors were free to travel.  See Fernandez v. State, 63 So. 3d 881, 884 (Fla. Dist. Ct. App. 2011) ("[T]he momentary opening of the gate for the defendant to leave was not an open invitation to the public, or by extension to the police, to enter. . . . No salesman or visitor could have entered the enclosed curtilage during the momentary opening.  The momentary opening of the gate for the express purpose of leaving did not alter the Dunn expectation-of-privacy factors.")[1].  The Court thus finds that the area from which officers first smelled marijuana constituted "curtilage" and that the officers' physical entry into that area implicated Defendants' Fourth Amendment protections.

### c.  Consent

The Government nonetheless argues that Defendants impliedly consented to the police officers' entry.

"One of the well-established exceptions to the [Fourth Amendment's] probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."  United States v. Garcia, 890 F.2d 355, 360 (11th Cir.1989).  Courts look to several factors in order to determine whether a defendant's consent to search was voluntary, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no

---

[1]  Fernandez is a state court case and is not binding authority.  However, because it involves an application of federal constitutional law and addresses materially identical facts, the Court finds its reasoning persuasive.

incriminating evidence will be found.  United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001).

Consent cannot be premised on a mere submission to a claim of lawful authority. Florida v. Royer, 460 U.S. 491, 497 (1983).

Furthermore, "the government may not show consent to enter from the defendant's failure to object to the entry.  To do so would be to justify entry by consent and consent by entry."  United State v. Gonzalez, 71 F.3d 819, 830 (11th Cir. 1996) (quoting United States v. Shaibu, 920 F.2d 1423, 1427 (9th Cir. 1990)), overruled on other grounds by Arizona v. Gant, 556 U.S. 332 (2009).   Although "yielding the right of way" in response to a request for admittance may constitute voluntary consent, see United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002), the mere failure to object when officers follow someone into their home does not, Gonzalez, 71 F.3d at 829–30; Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1329 (11th Cir. 2006).

Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances.  United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).  The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.  United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987).

In line with the foregoing, the Court finds no showing of voluntary consent to support the officers' entry onto the curtilage of the Target Residence.  Officers Bartra, Rios, and Benavides never asked Defendants for permission to enter the fence/gate

11

boundary.  Nor did Defendants otherwise manifest consent for them to enter.  The Court thus concludes that Defendants did not voluntarily consent—either expressly or tacitly—to the officers' entry.

And for this reason, as well as those reasons articulated <u>supra</u>, the Court concludes that the officers' entry onto the property violated Defendants' Fourth Amendment rights.

### d.  Suppression

Evidence obtained in violation of a defendant's Fourth Amendment rights may not be used against him in a subsequent criminal prosecution.  <u>See</u> <u>Weeks v. United States</u>, 232 U.S. 383, 398 (1914).  This exclusionary rule further prohibits introduction of derivative evidence that is acquired as an indirect result of an unlawful search.  <u>Murray v. United States</u>, 487 U.S. 533, 536–37 (1988).

In explaining whether police illegality will support the suppression of evidence, the Supreme Court has stated that the appropriate question to ask is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963).  The Eleventh Circuit has identified three circumstances in which the evidence can be said to have been obtained by means "sufficiently distinguishable" from the initial illegality such that suppression is not necessary.

> First, the challenged evidence will be admissible under the "inevitable discovery" doctrine if it inevitably or ultimately would have been discovered by lawful means without reference to the police misconduct. Second, under the "independent source" doctrine, the challenged evidence will be admissible if it derived from a lawful source independent of the

12

> illegal conduct.  Third, the challenged evidence will be admissible under the "attenuation" doctrine if the causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint.

United States v. Terzado–Madruga, 897 F.2d 1099, 1113 (11th Cir. 1990) (internal citations omitted).

Here the Court has concluded that police unlawfully entered the Target Residence's curtilage without a warrant, probable cause, or consent.  Only after entering the curtilage did they smell marijuana and hear the sounds of marijuana-grow-house equipment.  Those observations supplied the probable cause supporting the search warrant, which in turn led to the discovery of the marijuana plants and grow-house paraphernalia inside the Target Residence.  The Government advances none of the above-reference doctrines—i.e., inevitable discovery, independent source, or attenuation—suggesting a disconnection between the unlawful entry and the evidence recovered.  The Court therefore finds all seized evidence a product of the officers' initial illegality.  The Court further finds that Defendants' statements, although made post-Miranda, were obtained on-the-scene and contemporaneously with the officers' unlawful presence.  The Court thus concludes that the statements were not sufficiently attenuated to withstand the initial taint.[2]  Cf. United States v. Edmondson, 791 F.2d 1512, 1515–16 (11th Cir. 1986).

---

[2] To be sure, Lopez's statements were obtained following a traffic stop for driving with an expired license.  But the evidence makes clear that at the time Lopez was stopped, officers had detected marijuana at the Target Residence as a result of their unlawful entry, and Lopez was transported, Mirandized, and questioned for purposes of the drug investigation.

13

Accordingly, the Court finds all evidence and statements obtained after the unlawful entry inadmissible under the exclusionary rule as fruit of the poisonous tree.

### e.  Good-Faith Exception

The Government finally argues that the good-faith exception to the exclusionary rule should nonetheless permit admission of the seized evidence.

In <u>United States v. Leon</u>, 468 U.S. 897 (1984), the Supreme Court established a good-faith exception to the Fourth Amendment exclusionary rule.  <u>Id.</u> at 913.  The Court modified the exclusionary rule "so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause."  <u>Id.</u> at 900.  Since the purpose of the exclusionary rule is to deter unlawful police misconduct, when officers engage in "objectively reasonable law enforcement activity" and have acted in good faith when obtaining a search warrant from a judge or magistrate, the <u>Leon</u> good faith exception applies.  <u>Id.</u> at 919–20.

However, the "good-faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search."  <u>United States v. McGough</u>, 412 F.3d 1232, 1240 (11th Cir. 2005) (quoting <u>United States v. Wanless</u>, 882 F.2d 1459, 1466 (9th Cir. 1989)); <u>see also</u> <u>United States v. Reilly</u>, 76 F.3d 1271, 1280 (2nd Cir. 1996) (good-faith exception inapplicable where "[t]he issuance of the warrant was itself premised on material obtained in a prior search that . . . was illegal."). In other words, while the <u>Leon</u> exception may excuse unlawful post-warrant conduct stemming from a magistrate's erroneous probable cause assessment, it will not excuse

14

unlawful pre-warrant conduct used to obtain information supplying probable cause.  See also LaFave, supra, § 1.3(f) & n.89 ("[W]hen the warrant-issuing process leaves totally unresolved the lawfulness of the prior police activity, then there is no reason why that process should, via Leon, shield that activity from full scrutiny at the suppression hearing.").

Here, the Fourth Amendment violation occurred during officers' initial, pre-warrant entry onto the Target Residence's curtilage.  The officers then obtained a search warrant on the basis of observations made during the unlawful entry.  The defect in this case was not a mistaken probable cause determination by the warrant-issuing magistrate. So in line with the foregoing, the Court finds the Leon good-faith exception inapplicable.

**VI.    Conclusion**

For the reasons stated, the Court finds that all evidence and statements obtained subsequent to the officers' unlawful entry onto the Target Residence curtilage inadmissible under the exclusionary rule.  It is therefore **ORDERED AND ADJUDGED** that:

1.    The Report and Recommendation of Magistrate Judge John J. O'Sullivan (D.E. 81), issued November 8, 2011, is **ADOPTED** as to its factual findings but **REJECTED** as to its legal analysis and conclusion;

2.    The Supplemental Report and Recommendation of Judge O'Sullivan (D.E. 129), issued January 31, 2012, is **ADOPTED** in full; and

3.    Consistent with the Reports and this Order, Defendants' Motions to Suppress (D.E. 44, 48), filed September 13 and 15, 2011, are **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 2nd day of May,

2012.

Joan A. Lenard

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**